United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY RAMOS,<br><br>　　　　Petitioner,<br><br>　v.<br><br>A. P. KANE, warden,<br><br>　　　　Respondent.<br>　　　　　　　　　　　　　　　　／ | No. C 06-108 MHP (pr)<br><br>**ORDER DENYING HABEAS PETITION** |

### INTRODUCTION

Anthony Ramos, a prisoner at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

### BACKGROUND

Anthony Ramos was convicted on a guilty plea in Los Angeles County Superior Court of second degree murder. He was found to have used a firearm in the commission of the offense and to have suffered a prior felony conviction. In 1986, he was sentenced to a total term of 18 years to life in prison – 15 to life for the murder, plus 2 years for the use of a firearm plus 1 one year for the prior felony. His habeas petition does not concern that conviction directly, but instead focuses on an August 3, 2004 decision by a panel of the Board of Prison Terms (now known as the Board of Parole Hearings ("BPH")) finding him not suitable for parole.

1    The BPH identified several factors in support of its determination that Ramos was not
2 suitable for parole and would pose an unreasonable risk of danger to society or a threat to
3 public safety if he was released. The factors identified included the circumstances of the
4 murder, his prior criminality, an unstable social history, his inadequate performance in prison
5 (i.e., failure to upgrade educationally, failure to sufficiently participate in beneficial self-help
6 and therapy programs, and disciplinary history), and his need to make firm parole plans. The
7 specifics regarding the crime and the circumstances supporting the finding of unsuitability
8 are described in the Discussion section later in this order.
9    Ramos sought relief in the California courts. The Los Angeles County Superior Court
10 denied his petition for writ of habeas corpus in 2005 in a reasoned order. Resp. Exh. 2. The
11 California Court of Appeal summarily denied his petition for writ of habeas corpus and the
12 California Supreme Court summarily denied his petition for review. Resp. Exhs. 3-6.
13    Ramos then filed his federal petition for writ of habeas corpus. The court construed
14 Ramos' federal petition for writ of habeas corpus to allege two claims: (1) his right to due
15 process was violated because there was not sufficient evidence to support the BPH's decision
16 and (2) the decision violated the terms of his plea bargain. Respondent filed an answer.
17 Petitioner filed a traverse. The matter is now ready for a decision on the merits.

## JURISDICTION AND VENUE

19    This court has subject matter jurisdiction over this habeas action for relief under 28
20 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because Ramos is
21 incarcerated and the challenged action occurred at the Correctional Training Facility in
22 Soledad. Soledad is in Monterey County, California, within this judicial district. 28 U.S.C.
23 §§ 84, 2241(d).

## EXHAUSTION

25    Prisoners in state custody who wish to challenge collaterally in federal habeas
26 proceedings either the fact or length of their confinement are required first to exhaust state
27 judicial remedies, either on direct appeal or through collateral proceedings, by presenting the
28 highest state court available with a fair opportunity to rule on the merits of each and every

2

claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).  Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A. <u>Sufficiency Of Evidence Claim</u>

    1. <u>Due Process Requires That Some Evidence Support A Parole Denial</u>

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability  proceedings.  See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).  "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the

1  evidence.  Instead, the relevant question is whether there is any evidence in the record that
2  could support the conclusion reached'" by the parole board.  <u>Id.</u> at 1128 (quoting
3  <u>Superintendent v. Hill</u>, 472 U.S. at 455-56).  The "some evidence standard is minimal, and
4  assures that 'the record is not so devoid of evidence that the findings of the . . . board were
5  without support or otherwise arbitrary.'"  <u>Id.</u> at 1129 (quoting <u>Superintendent v. Hill</u>, 472
6  U.S. at 457).  The some evidence standard of <u>Superintendent v. Hill</u> is clearly established law
7  in the parole context for purposes of § 2254(d).  <u>Sass</u>, 461 F.3d at 1129.

        A critical issue in parole denial cases concerns the BPH's use of evidence about the murder that led to the conviction.  Three Ninth Circuit cases provide the guideposts for applying the <u>Superintendent v. Hill</u> some evidence standard on this point: <u>Biggs v. Terhune</u>, 334 F.3d 910 (9th Cir. 2003), <u>Sass</u>, 461 F.3d 1123, and <u>Irons v. Carey</u>, 479 F.3d 658 (9th Cir. 2007).  <u>Biggs</u> explained that the value of the criminal offense fades over time as a predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  <u>Biggs</u>, 334 F.3d at 916-17.  <u>Biggs</u> upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  <u>Id.</u> at 916.  Next came <u>Sass</u>, which criticized the <u>Biggs</u> statements as improper and beyond the scope of the dispute before the court:  "Under AEDPA it is not our function to speculate about how future parole hearings could proceed."  <u>Sass</u>, 461 F.3d at 1129.  <u>Sass</u> determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability.  <u>See id.</u> at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at

4

1  subsequent parole consideration hearing).  Recently, Irons determined that due process was
2  not violated by the use of the commitment offense and pre-offense criminality to deny parole
3  for a prisoner 16 years into his 17-to-life sentence.  Irons emphasized that all three cases
4  (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a
5  prisoner unsuitable for parole solely on the basis of his commitment offense comports with
6  due process, the decision was made before the inmate had served the minimum number of
7  years required by his sentence."  Irons, 479 F.3d at 665; see e.g., id. at 660 (inmate in 16th
8  actual year of his 17-to-life sentence).

9        The message of these three cases is that the BPH can look at immutable events, such
10 as the nature of the conviction offense and pre-conviction criminality, to predict that the
11 prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight
12 to be attributed to those immutable events should decrease over time as a predictor of future
13 dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and
14 Irons).  Sass did not dispute the principle that, other things being equal, a murder committed
15 50 years ago is less probative of a prisoner's current dangerousness than one committed 10
16 years ago.  Not only does the passage of time in prison count for something, exemplary
17 behavior and rehabilitation in prison count for something according to Biggs and Irons.
18 Superintendent v. Hill's standard might be quite low, but it does require that the decision not
19 be arbitrary, and reliance on only the facts of the crime might eventually make for an
20 arbitrary decision.

21       Having determined that there is a due process right, and that some evidence is the
22 evidentiary standard for judicial review, the next step is to look to state law because that sets
23 the criteria to which the some evidence standard applies.  One must look to state law to
24 answer the question, "'some evidence' of what?"

25       2.     State Law Standards For Parole For Murderers In California
26       California uses indeterminate sentences for most non-capital murderers, with the term
27 being life imprisonment and parole eligibility after a certain minimum number of years.  A
28 first degree murder conviction yields a base term of 25 years to life and a second degree

5

1    murder conviction yields a base term of 15 years to life imprisonment.  See In re
2    Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal
3    Code § 190.   The upshot of California's parole scheme described below is that a release date
4    normally must be set unless various factors exist, but the "unless" qualifier is substantial.

5           A BPH panel meets with an inmate one year before the prisoner's minimum eligible
6    release date "and shall normally set a parole release date. . . . The release date shall be set in a
7    manner that will provide uniform terms for offenses of similar gravity and magnitude in
8    respect to their threat to the public, and that will comply with the sentencing rules that the
9    Judicial Council may issue and any sentencing information relevant to the setting of parole
10   release dates." Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the
11   panel "shall set a release date unless it determines that the gravity of the current convicted
12   offense or offenses, or the timing and gravity of current or past convicted offense or offenses,
13   is such that consideration of the public safety requires a more lengthy period of incarceration
14   for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal.
15   Penal Code § 3041(b).

16          One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole
17   date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A
18   parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A
19   parole date set under this article shall be set in a manner that provides uniform terms for
20   offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The
21   regulation also provides that "[t]he panel shall first determine whether the life prisoner is
22   suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be
23   found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose
24   an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §
25   2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal.
26   Code Regs. § 2402(b).

27          The regulations contain a matrix of suggested base terms for several categories of
28   crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix

6

of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. Some prisoners estimate their time to serve based only on the matrix. However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires the prisoner first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole"). The California Supreme Court's determination of state law in Dannenberg is binding in this federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

3.  Some Evidence Supports The BPH's Decision In Ramos' Case

The BPH found Ramos unsuitable for parole based on the circumstances of the murder, his prior criminality and violence, an unstable social history, his inadequate performance in prison (i.e., failure to upgrade educationally, failure to sufficiently participate in beneficial self-help and therapy programs, and disciplinary history), and his need to firm

7

1  up his parole plans.  The Los Angeles County Superior Court upheld the decision in a

2  reasoned order.  See Resp. Exh. 2.  That court correctly identified the "some evidence"

3  standard as the applicable standard for judicial review, as evidenced by its citation to In re

4  Rosenkrantz, 29 Cal. 4th 616 (Cal. 2002), which had cited and adopted the Superintendent v.

5  Hill some evidence standard as the proper standard for judicial review of evidentiary

6  sufficiency for parole denial cases.  See Rosenkrantz, 29 Cal. 4th at 665-67.  Because the Los

7  Angeles County Superior Court's decision is the last reasoned decision, that is the decision to

8  which § 2254(d) applies.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v.

9  Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006).

          a.      Commitment Offense

The facts of the crime were described in the life prisoner evaluation report:

> On 11/16/84, following a struggle over a gun, Anthony Ramos chased John Shaffer, the victim, over 500 feet before shooting him from behind.  Shaffer was shot in the back and in the back of the head.  Ramos attempted to say that the gun he used belonged to Shaffer; however, there were witnesses willing to testify that Shaffer never carried a gun.  After killing Shaffer, Ramos stole his truck.  The next day, Ramos gave the stolen truck to his father.  Ramos['] father took the vehicle to DMV in an attempt to register it in [his] name.  The DMV notified the Los Angeles Police Department that the vehicle had been reported stolen.  Nearly a year later, a crime partner of Shaffer reported to the police that Shaffer was driving a stolen truck on the day he was murdered.  Police contacted the father who indicated he received the truck from Ramos.  Ramos['] father notified the police as to the whereabouts of his son, who was a Parolee-at-large.  On 12/09/85 Ramos was arrested. Ramos admitted to the murder in a written statement.

Pet. Exh. B, p. 1.  The probation officer reported that Ramos stated that the shooting took

place after he and the victim had been drinking and arguing.  Resp. Exh. 1, p. 2.  Ramos told

the probation officer that he was not guilty, confessed only under pressure, and pled guilty

because he did not think he could get a fair trial.  See id. at 10.

At the parole suitability hearing, Ramos admitted that he had killed the victim.  He

stated that the victim had challenged him to a fight, and when Ramos was beating up the

victim, the victim pulled out a gun.  RT 13-17.  Ramos stated that the gun initially discharged

when he pushed the victim off him.  Ramos' version was somewhat contradictory, as he

indicated he shot the victim only once and then stated that he chased the victim and shot him

a second time, although he couldn't remember where he shot the victim.  RT 15-17.  Ramos

1 acknowledged that he initially blamed his father for the killing. RT 18-19.

2 A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). The factors to be considered in determining whether that circumstance exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled or mutilated during or after the offense," "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. § 2402(c)(1). The BPH considered a circumstance and factors proper under California law.

The BPH considered the circumstances of the murder and concluded that it indicated unsuitability. "The offense was carried out while the inmate and the victim were both under the influence of alcohol and marijuana. The motive for the crime was very trivial in relation to the offense in that this crime started out as an argument." RT 59. The BPH also noted that Ramos had an opportunity to terminate the fight when the victim ran away, but instead chased after him and shot him again. Id. The BPH stated that Ramos "committed the offense in an especially cruel manner." RT 64. The BPH acknowledged that there was some question of whether the victim was shot in the chest or back as well as in the head and the time at which each of the shots was fired at what point, see RT 64, but regardless of when they were fired, there were two shots fired, one of the shots was admittedly fired when the victim was fleeing, and the victim died.

There was sufficient evidence to support the finding that the circumstances of the commitment offense tended to show unsuitability. The BPH noted that the victim was shot while fleeing from Ramos and at least one shot was fired after Ramos had a clear opportunity to stop. There was evidence to support the BPH's finding that the shooting was for a very trivial motive, i.e., because the victim had challenged Ramos to a fight. Had the murder been the only circumstance relied upon, the result might be different here, but the murder was just one part (albeit the largest part) of the picture. "Circumstances which taken alone may not

9

firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." 15 Cal. Code Regs. § 2402(b).

    b.  Prior Criminality

  The BPH is directed by the regulation to consider all relevant and reliable information in determining suitability for parole, including the prisoner's "past criminal history, including involvement in other criminal misconduct which is reliably documented." 15 Cal. Code Regs. § 2402(b). Among the specific circumstances listed as tending to indicate unsuitability is a previous record of violence, such as if the prisoner had "on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age." 15 Cal. Code Regs. § 2402(c)(2).

  Ramos had a significant criminal history when he was arrested for the murder of Shaffer. Just two years earlier, Ramos had been charged with murder, pled guilty to the lesser offense of being an accessory to a felony, and received the upper term of 3 years in prison for the offense. Resp. Exh. 1, p. 4. His co-defendant in that case pled guilty to two second degree murders and went to prison. The probation officer described that criminal episode:

> Victim Jeffery Horton, 18 years of age, was crossing the street when he was shot from [Ramos'] van. He later expired. Michael Rowell, age 21, was found lying in an alley. Both had been shot from [Ramos'] van. [Ramos] was not identified as the shooter. [Ramos] admitted driving the van at the time Horton was shot. [Ramos] had been involved in a fight two weeks earlier and had been beaten by several people. Horton was involved in the beating. When questioned why the victim was shot from the van, [Ramos] replied, "It was easier." [Ramos] denied being involved in the killing of Rowell.

Resp. Exh. 1, pp. 4-5. Ramos' criminal record also included an arrest as a juvenile for possession of marijuana (for which he was counseled and released), an arrest for being a minor in possession of alcohol (for which he was put on probation), an arrest for burglary (which led to him being declared a ward of the court), and a DUI arrest (for which he was referred to traffic court). Id. at 4. At the time Ramos murdered Shaffer, he was on parole for being an accessory to a felony based on the murders of the Horton and Rowell.

  The BPH considered circumstances proper under California law in finding that

10

Ramos' record of violence showed he was unsuitable for parole. As the probation officer noted in 1986, Ramos had "the unenviable distinction of having been arrested twice for murder within the short period of three and one-half years." Resp. Exh. 1, p. 11. There was plenty of evidence to support the BPH's determination that Ramos' "pattern of criminal conduct was escalating somewhat and he failed previous grants of probation and parole and cannot be counted upon to avoid criminality. And he failed to profit from society's previous attempts to correct his criminality." RT 60. As with the commitment offense, Ramos' prior criminality was but one part of the overall picture of him that the BPH properly considered in determining whether he was suitable for parole.

          c. <u>Unstable Social History</u>

An unstable social history is specifically listed as a circumstance tending to indicate unsuitability. See 15 Cal. Code Regs. § 2402(c)(3).

The BPH relied on Ramos' unstable social history in support of the decision that he was not suitable for parole. "His parents were separated and he lived with his mother and then went to live with his father." RT 60-61. He dropped out of school in the tenth grade. He had used alcohol and marijuana and had experimented with heroin and PCP. RT 61.

There was sufficient evidence to support the BPH's reliance on this circumstance: Ramos had a fractured family, had dropped out of high school, and had a rather extensive history of substance abuse as a minor. The presence of these facts alone would not alone support a finding that an inmate was unsuitable for parole, but could be considered as part of the overall picture of Ramos. "Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." 15 Cal. Code Regs. § 2402(b).

          d. <u>Institutional Performance</u>

Section 2402(b) specifically allows the BPH to consider a great range of relevant and reliable information, such as the prisoner's social history and mental state. The BPH also may consider evidence that the "prisoner has engaged in serious misconduct in prison or jail" as tending to indicate unsuitability for parole. 15 Cal. Code Regs. § 2402(6).

11

1     The BPH found that Ramos' performance in prison tended to show he was not suitable for parole. The BPH noted that he had programmed in a limited manner while incarcerated. He had failed to upgrade educationally and obtain his GED, although an earlier BPH panel had recommended he do so. RT 30-31, 61. Ramos indicated it was not an important goal when he told the BPH, "I haven't gotten around to doing it." RT 30-31. The BPH also relied on the fact that Ramos had not sufficiently participated in beneficial self-help and therapy programs. Id. Ramos had participated in Alcoholics Anonymous in 1994, but not in the decade thereafter. RT 33. There was substantial support for the BPH's determination that he needed further programming. He had a history of drug and alcohol abuse before his incarceration, had been drinking alcohol and smoking marijuana on the day he murdered his victim, and had been caught trying to make alcohol while in prison. See RT 26, 32. Nonetheless, he denied having any problem with alcohol and drugs, RT 27. The BPH panel was not required to credit that denial especially with so much contrary evidence of a history of substance abuse.

      Ramos also had a significant disciplinary record. He had received five CDC-115s for more serious rules violations, the most recent of which was about six years before the hearing. RT 61. Ramos' rule violations were for being out of bounds in 1988, manufacturing alcohol in 1988, possession of another inmate's radio in 1989, "mutual combat without serious injury" in 1998, and "threatening staff" in 1998. See Pet. Exh. B, disciplinary sheet. He had received seven counseling chronos for minor rules infractions, the most recent of which was about ten years before the hearing. Although Ramos repeatedly characterizes himself as a model prisoner, the evidence contradicts that characterization.

      The BPH's consideration of and reliance on Ramos' unfavorable conduct in prison and need for further programming was proper and was supported by sufficient evidence.

      e.    Parole Plans

      The prisoner's parole plans can be considered by the BPH. Among the circumstances listed as tending to show suitability are the existence of realistic plans for the release or the development of marketable skills that can be put to use upon release. See 15 Cal. Code

12

1  Regs. § 2402(d)(8).  Section 2402(b) allows the BPH to consider "any other information
2  which bears on the prisoner's suitability for release."

3        The BPH noted that Ramos' "parole plans need to be firmed up."  RT 62.  The
4  commissioner told him that the letters of support for employment and housing prospects
5  should be specific and current, although he did not also that Ramos had good support and a
6  very supportive wife.  RT 62.

7        There was some evidence to support the BPH's reliance on the absence of adequate
8  parole plans.  Ramos had testified he intended to live with his mother, "I guess."  RT 43.  He
9  also did not have a job arranged.  See RT 42-44.  This is another factor that alone could not
10  support the denial of parole but could be considered as one part of the overall picture that
11  showed Ramos was not suitable for parole.  See 15 Cal. Code Regs. § 2402(b).

12        f.      There Was Enough Evidence To Support The Decision

13        As with many parole denial habeas petitions, there is not much dispute about the facts,
14  but instead about what they mean.  The weight to be attributed to the commitment offense
15  and pre-conviction criminality may fade over time as a predictor of current dangerousness,
16  but the rate at which those facts fade as predictors slows down when the prisoner engages in
17  further misconduct and does not demonstrate rehabilitation.  Here, Ramos had accumulated
18  five CDC-115 rule violation reports.  Although the most recent CDC-115s occurred six years
19  before the hearing, they were for mutual combat and threatening staff, both of which indicate
20  a continued tendency toward violence.  These rules violations in prison plus Ramos'
21  involvement with at least one other murder before the commitment offense raise grave
22  concerns about his violent tendencies.  They indicate that his rehabilitation is still a work in
23  progress and undermine his assertion that he is a model prisoner.  While Ramos decries the
24  use of the unchanging evidence of pre-incarceration events, in-prison behavior is something
25  the prisoner has control over, and the fact that a prisoner continues to receive disciplinary
26  write-ups indicates that he does not have a very high level of self-control, especially when
27  the misconduct occurs years into the sentence and at a time when he should realize how it
28  will reflect on his parole suitability.  Biggs and Irons did not stand for the proposition that in-

1  prison behavior doesn't matter -- to the contrary, they stand for the proposition that old bad
2  facts can at a certain point be overcome by more recent good facts regarding a prisoner's
3  ability to conform to societal norms.  Ramos' continued misconduct in prison plus marginal
4  and outdated programming to better himself support the BPH's view that he is not suitable for
5  parole and would present a danger to society if released on parole even though he had
6  already been in prison 18 actual years since his 18-to-life sentence was imposed.  Even his
7  attorney agreed that he was not suitable for parole at the 2004 hearing and that Ramos -- who
8  had skipped several parole hearings – needed to hear from the BPH what steps he needed to
9  take in prison to move toward being found suitable for parole at some date in the future.  RT
10 57.  Ramos did not disagree with his attorney's assessment of the situation.  RT 58.

11         The Los Angeles County Superior Court went through each of the factors relied on by
12 the BPH to determine whether there was some evidence to support the decision.  The fact
13 that Ramos shot the victim twice after being challenged to a fight provided some evidence to
14 support the BPH's finding that the motive was very trivial.  Id. at 1-2.  Ramos' earlier
15 conviction of being an accessory to a felony based on his driving a car from which a co-
16 defendant shot and killed two people provided some evidence to support the BPH's finding
17 that Ramos had a prior history of violence.  Id. at 2.  Evidence that Ramos dropped out of
18 school in the tenth grade because he was "rebellious," smoked marijuana since age 13 or  14,
19 and had been declared a ward of the court in 1979 provided some evidence to support the
20 BPH's finding that Ramos had a history of unstable or tumultuous relationships with others.
21 Id.  Evidence that Ramos participated in AA in 1994 but not since then despite the BPH's
22 recommendations and that Ramos failed to get his GED despite the BPH's recommendation
23 that he do so provided some evidence that Ramos had not sufficiently participated in self-
24 help programming. Id.

25         The Los Angeles Superior Court stated that the BPH did not rely on Ramos'
26 disciplinary history while incarcerated, his parole plans and the correctional counselor's
27 conclusions regarding his dangerousness to determine suitability.  Id. at 1.  This statement
28 incorrectly summarizes the record, as the BPH's decision denying parole specifically

14

1 mentioned Ramos' disciplinary history, RT 61, Ramos' need to firm up his parole plans, RT
2 62, and Ramos' counselors' opinions, RT 62-63.  The Los Angeles Superior Court's
3 determination that the other circumstances relied on by the BPH to find Ramos unsuitable
4 were supported by some evidence is not an unreasonable application of or contrary to the
5 <u>Superintendent v. Hill</u> standard.  There was some evidence to support the BPH's
6 determination that Ramos was unsuitable for parole based on the circumstances of the
7 commitment offense, his prior criminality and unsuitable social history, and his unimpressive
8 in-prison behavior.  These circumstances could be considered alone as well as cumulatively
9 in determining parole suitability.  <u>See</u> 15 Cal. Code Regs. § 2402(b).  The Los Angeles
10 County Superior Court's rejection of Ramos' insufficient evidence claim was not contrary to
11 or an unreasonable application of the <u>Superintendent v. Hill</u> some evidence standard.  He is
12 not entitled to the writ on this claim.

13 B.     <u>Breach Of Plea Agreement Claim</u>

14     Ramos contends that the BPH's determination that he was not suitable for parole
15 violated his plea agreement.  He does not identify any particular term in that agreement that
16 he was to be released on a date certain or after a certain number of parole hearings.  Rather,
17 his argument is that the BPH was contractually bound to treat his second degree murder
18 conviction less seriously than a first degree murder conviction.  He also contends that the
19 plea agreement conferred on him a benefit that "he would be eligible for release on parole
20 after 11 years."  Petition, p. GR2-1.

21     The Los Angeles County Superior Court rejected this claim in a short but reasoned
22 decision.  Resp. Exh. 2, p. 3 & fn. 3.  That court rejected Ramos' arguments relating to
23 California Penal Code § 3041 and the plea agreement, reasoning that Ramos was within the
24 indeterminate life sentence he had received upon conviction.  The court explained that the
25 <u>Dannenberg</u> decision made it clear that the BPH's primary concern in determining parole
26 suitability is the safety of the community.  "Here the record reflects the Board considered
27 petitioner's post conviction gains but still concluded Petitioner would pose an unreasonable
28 threat to public safety. (Penal Code § 3041(b).)  Petitioner received an indeterminate

15

1 sentence with a maximum of life in prison.  Under Dannenberg petitioner should expect to
2 serve his maximum sentence unless and until the Board acts to fix a shorter term." Resp.
3 Exh. 2, p. 3.
4     "Plea agreements are contractual in nature and are measured by contract law
5 standards."  Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003) (quoting United States v.
6 De la Fuente, 8 F.3d 1333, 1337 (9th Cir. 1993)).  Although a criminal defendant has a due
7 process right to enforce the terms of a plea agreement, see Santobello v. New York, 404 U.S.
8 257, 261-62 (1971), there is no evidence that Ramos' subjective expectations about how
9 parole would be decided were part of the plea agreement.  He contends the plea deal made
10 him eligible for release after 11 years.  To the extent "eligible" for parole means that he
11 would be considered for parole, Ramos has not shown he did not receive that consideration.
12 To the extent he believes eligibility means actual release on parole, he has not shown that
13 such a term existed in his plea agreement.  Eligibility does not mean suitability, and under
14 state law (as it existed when he was sentenced and as it exists now), the inmate must be
15 found suitable before his term and release date are set.  Ramos' sentence upon his conviction
16 based on a plea agreement was 18-to-life and not a straight 18 year sentence.  He has
17 received the parole considerations to which he was entitled under that agreement and
18 sentence.  Unlike the case of Brown v. Poole, 337 F.3d at 1157-58, on which he relies,
19 Ramos does not identify any actual promise made to him or any particular term of the
20 agreement that has been breached.  The Brown petitioner was able to point to explicit
21 statements in the plea colloquy that led her to believe she would get out in half the minimum
22 years if she behaved herself in prison.  See id. at 1160 ("Brown heard and acknowledged the
23 prosecutor's promises, and in the process of waiving her right to trial she accepted them as
24 part of her bargain.  'The intent of the parties becomes clear upon an examination of the
25 language of the plea agreement and the conduct of the parties during the plea colloquy.")  As
26 the state court concluded, Ramos' agreed-upon sentence included a maximum of life
27 imprisonment and the BPH has not kept him in custody beyond that term.  The Los Angeles
28 County Superior Court's rejection of Ramos' breach of plea agreement claim was not an

unreasonable application of or contrary to clearly established federal law as determined by the U.S. Supreme Court. See Resp. Exh. 2, p. 3. Ramos' claim that his plea agreement was breached in violation of his right to due process fails.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: April 25, 2007

Marilyn Hall Patel
United States District Judge

# **NOTE**

1. The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).